**The STATE of Texas, Appellant,**

v.

**Milton F. RUMERY, Appellee.**

**No. 7579.**

Court of Civil Appeals of Texas.

Texarkana.

June 9, 1964.

Rehearing Denied July 7, 1964.

A. L. Vickers, W. G. Walley, Jr., Beaumont, for appellant.

Frank M. Adams, Beaumont, for appellee.

CHADICK, Chief Justice.

This is an eminent domain case. The judgment of the trial court awarding $1500.00 to a land owner as compensation for land taken in a condemnation proceeding by the State of Texas is affirmed.

The land taken is a part of an abandoned easement that reverted to the fee owner. For many years—the record does not furnish specific dates—the Texas & New Orleans Railroad's 100 foot wide right-of-way was adjacent to and ran parallel in a generally north and south direction with Eleventh Street in the City of Beaumont, Texas. In more recent times, and at the time of the trial, Eleventh Street is the designated route of several major highways, U. S. 69, U. S. 96, and U. S. 287, and had an average daily traffic count of 15,000 vehicles. A short time before this litigation's inception the Texas & New Orleans Railroad abandoned this strip of right-of-way, and the parties here agree that the east 50 feet of the right-of-way for a distance of 259 feet reverted to and became the fee simple property of the appellee, Milton F. Rumery, while the west 50 by 259 feet reverted to the King Estate, not a party to this proceeding.

Prior to abandonment of the right-of-way appellee Rumery's home was located on a lot that abutted the east edge of the railroad right-of-way. The Rumery house was built near the east side of his lot and faced eastward on Anderson Street. As the house is situated with the reverted

land to its rear the strip became a part of Rumery's back lot, though it lay outside a chain link fence enclosing the original Rumery lot, and was marred by a ditch running its length that had served as a part of the railroad right-of-way drainage system. The strip was also burdened with a telegraph line easement ten feet wide for the length of the plot.

Considered as segregated land at the time of taking (January of 1963) Rumery's reverted tract was separated from Eleventh Street by the west half of the right-of-way that vested in the King Estate, and the only access—without crossing the property of strangers—was from Anderson Street across the original Rumery lot. The strip lay in an area zoned for residential use. However, there was evidence that the zoning authorities had rezoned for commercial use every tract coming out of the reverted right-of-way when application was made therefor and had set a pattern, amounting to a policy, of doing so upon application.

The State offered the testimony of three land appraisers, and their qualifications are unquestioned. Their testimony in summary was that the highest use to which the condemned tract could be put was residential; that it might be assimilated into the owner's homestead and used as a part thereof. One expressed the opinion, and the approach of the other two was in harmony, that the only permissible appraisal technique would be to consider the strip as residential property of the nature of that fronting on Anderson, a residential street in front of the Rumery house. As a basis for the appraisers' opinions, testimony of sale price of numerous tracts the witnesses considered to be comparable was admitted. This familiarity with market price of real estate, and all other factors they considered relevant, led them to find the tract's value ranged from $150.00 to $350.00.

The appellee's one appraiser, whose qualification likewise is unquestioned, concluded that the highest and best use the condemned strip could be put to would be commercial because of the proximity (50 feet) to much traveled Eleventh Street. He considered the condemned strip had attributes of commercial use because the King Estate's narrow fifty foot strip between the condemned tract and Eleventh Street would not support ordinary commercial development unless adjacent land was put with it to give it greater depth. The appraiser prepared to determine the value of the condemned strip by ascertaining the sale price of lots in the vicinity abutting upon Eleventh Street with a depth approximating the railroad right-of-way's one hundred foot depth. One sale studied involved a strip of the abandoned right-of-way. On the basis of the price paid for land in several such transactions and considering the Rumery strip as having elements of similarity, and upon his knowledge of the value of real estate in the area, he appraised the condemned tract's fair market value at $4,485.00. In explanation of his valuation opinion a part of his testimony is quoted, to-wit:

"Q. Now, would you explain to the jury how you arrived at the figure of forty-four hundred and eighty-five dollars as the value for this property? This property does not front on Eleventh Street, is that correct?

"A. That's correct.

"Q. Would you tell the jury how you arrived at that conclusion of value?

"A. Well, I have considered this from many angles, and I think the most probable explanation would be that if someone owned the fifty feet in front of this property then the fifty feet in question would have a value, because the fifty foot depth is not adequate, along Eleventh Street, so the demand would certainly be there for a second fifty feet. On the con-

trary, if these people owned the first fifty feet fronting on Eleventh Street, it would certainly enhance —.

\*    \*    \*    \*    \*    \*

"Q.  All right.  As I understand your testimony up to now, it's your opinion that a tract of land such as the one that's in front of this, fronting on Eleventh Street, that that does not have a one hundred dollar a front foot value, is that correct?

"A.  That's correct.

"Q.  Because of its depth; it only has fifty feet?

"A.  Lack a bit.

\*    \*    \*    \*    \*    \*

"Q.  \* \* \* In appraising property in any neighborhood, is it true or false that the value factor, the various buildings, the various enterprises that are in that neighborhood, affect the value of all the property in the neighborhood; is that correct?

"A.  That's very true."

The State has briefed its four points of error, to-wit:

"Point of Error No. 1

"The trial court erred in admitting into evidence by the appellee's witness \* \* \* sales of property that physically fronted on an existing major highway facility where it was admitted that the subject property did not front on any highway on the date of taking, in that said sales were distinctly dissimilar to the subject property.

"Point of Error No. 2

"The trial court erred in admitting into evidence testimony as to what the value of the subject property would be when hypothetically com-

bined or used with other property under separate ownership.

"Point of Error No. 3

"The trial court erred in admitting into evidence testimony as to the value of the property being acquired by condemnation as commercial property when subject property was not commercial property on the date of taking herein.

"Point of Error No. 4

"That there is no evidence to support the verdict of the jury herein."

Common prudence would cause a buyer in a private deal to be influenced in the price that he would pay for the subject strip by the prices other parties had paid for land in its vicinity having some elements of the strip's commercial potential. If the buyer knew of no sale of an exactly similar tract he would be influenced by sales of tracts containing an area in some part comparable to the strip, such as a tract facing Eleventh Street, the rear half of which was comparable in a high degree to the strip, and which rear half had comparable commercial or economic use.  Knowledge of the arm length's market price of such other lots would influence the price he would willingly pay.  Sale prices of such other tracts probably would not be controlling with such buyer, but would be one of several factors he would consider in determining the price he would pay.  From the evidence it appears the appraiser used the prices paid in transactions he relied upon as one of several factors influencing his opinion of value.

In the search for market value the information an appraiser might gain from sales here shown is worthy of note, though the tracts are dissimilar in very important respects.  There are safeguards against these sales being accorded weight by the jury other than as a factor considered by the appraiser in arriving at his value conclusion.  The court's instruction limiting the

purpose for which the evidence is admitted and cross examination that emphasizes the negative aspects of comparability are the protective shields of the party resisting the impact of the appraisers' testimony. See The State of Texas v. Oakley, 163 Tex. 463, 356 S.W.2d 909 at 914, 95 A.L.R.2d 1207. The evidence was properly admitted. Houston v. Pillot, Tex.Com.App., 105 S.W. 2d 870, op. adpt.; Hays v. State of Texas, Tex.Civ.App., 342 S.W.2d 167, N.R.E.; State v. Morse, Tex.Civ.App., 342 S.W.2d 165, N.R.E.; State v. Sides, Tex.Civ.App., 348 S.W.2d 446, N.R.E.

The conclusion stated makes it unnecessary to discuss each point of error in detail, and they are each overruled. The judgment of the trial court is affirmed.